OPINION OF THE COURT
Nicholas Iacovetta, J.
This opinion addresses whether a Frye hearing is required before the prosecution can introduce the results of low copy number (hereinafter LCN) DNA testing or testimony concerning the forensic statistical tool (hereinafter FST) used to calculate likelihood probability ratios when testing a mixture containing several DNA profiles (see Frye v United States, 293 F 1013 [DC Cir 1923]).
Defendant is charged under indictment No. 2650/09 with the crime of murder in the second degree, Penal Law § 125.25 (3), and related crimes. The autopsy lists the cause of death as homicidal asphyxia caused, in part, by a sock placed in the victim’s mouth and duct tape used to bind her face and limbs.
LCN DNA testing of human DNA found on a piece of duct tape recovered from the victim’s ankles indicated the presence of a mixture of DNA material from at least two individuals. DNA comparisons were made by the New York City Office of the Chief Medical Examiner (hereinafter OCME) between the above DNA mixture and defendant’s DNA profile. Although OCME could not declare a positive match between the two samples, it also could not “exclude” defendant’s DNA profile as a contributor to the DNA mixture found on the duct tape. OCME used the FST to perform a statistical analysis using a mathematical equation based on Bayes’ Theorem[1] to determine the likelihood ratio[2] that defendant and one unknown, unrelated person are included in the above DNA mixture rather than two unknown, unrelated individuals. OCME concluded *484 that the DNA mixture found on the sample taken from the duct tape “is 586 times more probable if the sample originated from this defendant and one unknown, unrelated person than if it originated from two unknown, unrelated persons” (see defense affirmation, July 9, 2012, exhibit B).
Expert testimony based on scientific principles or procedures is admissible but only if the thing from which the deduction is made is sufficiently established to have gained general acceptance in the particular field in which it belongs (see Frye v United States, 293 F 1013, 1014 [1923]). The Frye test asks whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally (see People v Wesley, 83 NY2d 417, 422 [1994]). The particular procedure need not be “unanimously indorsed” by the scientific community but must be “generally acceptable as reliable” (see People v Middleton, 54 NY2d 42, 49 [1981]). Whether a particular technique represents a new or novel science is a separate and distinct inquiry from whether the scientific technique was applied correctly in a particular case (see Parker v Mobil Oil Corp., 7 NY3d 434, 447 [2006]). A Frye hearing is necessary only if expert testimony involves “novel or experimental matters” (see People v Byrd, 51 AD3d 267, 274 [1st Dept 2008], lv denied 10 NY3d 956 [2008], citing Parker v Crown Equip. Corp., 39 AD3d 347, 348 [1st Dept 2007]). The application of a generally accepted technique, even though its application in a specific case was unique or modified, does not require a Frye hearing (see Byrd, 51 AD3d 267; Styles v General Motors Corp., 20 AD 3d 338 [1st Dept 2005]). The Frye test concerns only the acceptability and reliability of the scientific technique and not the “adequacy of the specific procedures used to generate the particular evidence to be admitted” (see Wesley, 83 NY2d at 422).
A Frye hearing is necessary “only when the opposing party makes a timely request for such inquiry supported by authorities indicating that there may not be general scientific acceptance of the technique” (see State v Harris, 152 Ariz 150, 152, 730 P2d 859, 861 [Ariz Ct App 1986]). Defendant’s motion fails to meet that initial threshold because it is not supported by sufficient credible evidence demonstrating that either LCN DNA testing or the FST, when properly performed, is generally not acceptable in the scientific community. Instead it merely cites some experts who do not endorse the procedures used in this case. That is not a sufficient basis for granting a Frye hearing. *485 “General acceptance” does not mean unanimous acceptance (see Wesley, 83 NY2d at 423). The defense affirmations do not dispute the prosecutor’s main assertion, seen below, that many courts in multiple jurisdictions, as well as many other scientists and professional organizations, find the above procedures generally acceptable. Merely referencing two ongoing hearings in other counties without providing this court with any testimony from those hearings, or the affirmations by opposing counsel upon which the hearings are based, or simply citing an upcoming seminar which includes a panel discussion on reforms in the admission of DNA evidence, with no specific mention of LCN DNA testing or the FST, is likewise not a sufficient basis for granting a Frye hearing in this case. There is no doubt, as seen below, that both LCN DNA testimony and the FST, when properly performed, generate results accepted as reliable within the scientific community generally.
OCME uses high copy number (hereinafter HCN) PCR[3] based STR[4] DNA profiling when testing 100 picograms[5] or more of DNA. This PCR based technique of HCN DNA profiling was deemed generally acceptable and reliable making it admissible without the necessity of a pretrial hearing over a decade ago (see People v Hall, 266 AD2d 160 [1st Dept 1999], lv denied 94 NY2d 948 [2000]).
OCME uses LCN DNA profiling when testing less than 100 picograms of DNA. The difference between HCN and LCN testing is that in LCN testing the amplification process used to increase the number of copies of DNA is repeated 31 times instead of 28 times. This permits OCME to test smaller amounts of DNA. HCN DNA and LCN DNA testing, except for the above slight variation in the number of amplifications, employ the same four steps in analyzing the DNA sample: extraction,[6] *486 quantification,[7] amplification[8] and electrophoresis.[9] The same issues that arise in LCN DNA profiling can also arise in HCN DNA profiling: stutter,[10] allelic drop-out,[11] and allelic drop-in[12] (see People v Megnath, 27 Misc 3d 405, 413 [Sup Ct, Queens County 2010]). An individual receives half their DNA from their mother and half from their father. A person thus has two alleles at each locus, i.e., one from each parent (see defense affirmation, July 9, 2012 at 5, ¶ 8; People’s affirmation, July 27, 2012 at 3). This makes it relatively easy to determine if a single source DNA sample matches a suspect. A mixture of DNA contains more than two alleles at each locus which means that at least two people are present. This requires a forensic scientist to determine which alleles at a locus belong to one person and which belong to another. There is nothing new or novel about LCN DNA profiling. It simply represents the application of accepted and reliable procedures that are applied in a modified manner (see Byrd, 51 AD3d 267).
“A court need not hold a Frye hearing where it can rely upon previous rulings in other court proceedings as an aid in determining the admissibility of the proffered testimony” (see People v LeGrand, 8 NY3d 449, 457-458 [2007]). “Once a scientific procedure has been proved reliable, a Frye inquiry need not be conducted each time such evidence is offered” (see Wesley, 83 NY2d at 436). Novel scientific evidence may be admitted without any hearing at all by the trial court (see Wesley, 83 NY2d at 426, citing Matter of Lahey v Kelly, 71 NY2d 135 [1987]; People v Middleton, 54 NY2d 42 [1981]). A court may find a scientific test reliable based on general acceptance as shown through judicial opinions (see Matter of Lahey, 71 NY2d at 141).
In Megnath (27 Misc 3d 405), the court determined, after conducting a lengthy Frye hearing over the course of eight months, that LCN DNA testing is not a novel scientific technique and that, when properly performed, it is generally ac *487 cepted as reliable in the scientific community. Other New York trial courts have also admitted LCN DNA results in evidence after denying defense requests for a Frye hearing (see People’s affirmation, July 27, 2012 at 19 n 20). LCN DNA testing has been admitted in New York State trial courts over 125 times, and in a federal district court in the Southern District of New York without a Frye hearing (see People’s affirmation, July 27, 2012, exhibit I), and in courts of multiple other countries including Germany, the United Kingdom, Sweden and Switzerland (see People’s affirmation, July 27, 2012, exhibit C at 14 n 18). Our own Court of Appeals has approved this method of looking at other jurisdictions when deciding if evidence is accepted in the scientific community (see People v Jeter, 80 NY2d 818 [1992]). A dispute within the scientific community over the reliability of a procedure does not preclude a trial court from finding that the procedure is generally accepted (see People v Pope, 284 Ill App 3d 695, 672 NE2d 1321 [4th Dist 1996]).
Although OCME is the only government facility currently using LCN DNA testing, several private and academic laboratories, such as the University of North Texas, use LCN DNA testing (see People’s affirmation, July 27, 2012 at 14). OCME is the “gold standard” when it comes to DNA testing (see People’s affirmation, July 27, 2012, exhibit G). It has been certified to conduct LCN DNA testing since 2005, using it to help identify the remains of victims of the World Trade Center terror attack in 2001 (see People’s affirmation, July 27, 2012, exhibit H at 13 n 15 [noting that defendant’s own expert publicly endorsed OCME’s procedures and protocols for LCN testing when used to identify victims of the 9/11 terror attacks]). OCME’s own validation studies of LCN DNA testing (see People’s affirmation, July 27, 2012, exhibit C) were examined and certified by the New York State Commission on Forensic Science (NYSCFS) in 2005 (see People’s affirmation, July 27, 2012, exhibits E, F [listing the distinguished members of NYSCFS made up of scientists, prosecutors and defense attorneys]). OCME is also audited yearly by the National Forensic Science Technology Center (NFSTC), an outside agency that develops standards and programs for the accreditation of all public laboratories in New York State. It too approved the protocols developed by OCME for LCN DNA testing.
The FST is not a new or novel scientific technique (see People’s affirmation, Jan. 10, 2013, exhibits A-K). It is a computer software program that uses accepted mathematical equa *488 tions based on Bayes’ Theorem to calculate the likelihood ratio of obtaining a recovered mixture of DNA if the suspect is a contributor versus the probability of getting the same mixture if the suspect is not a contributor. It is not a novel or new theory that, when properly performed, lacks general acceptance in the relevant scientific community (see People v Tyrone Wortham, NY County, Sept. 6, 2012, Ward, J., indictment No. 3148/2011). OCME conducted exhaustive validation procedures before adopting FST (see People’s affirmation, Jan. 10, 2013 at 18, ¶ 22).
The mere fact that these validation studies were performed by OCME itself does not, as asserted by defense counsel, lessen their reliability (see defense affirmation, Dec. 14, 2012 at 5, ¶11). Instead, in-house validation affords the user the benefit of testing a procedure under the same conditions as in its contemplated use, i.e., using the same equipment, personnel and techniques for which its use is intended. The defense opines that the FST software must be subjected to rigorous scrutiny, that is, validation and peer review, by scientific bodies outside of OCME to assure its scientific reliability (see defense affirmation, Dec. 14, 2013 at 7, ¶ 17). That is exactly what occurred here. Any speculation questioning the reliability of OCME’s own validation studies of FST is silenced by the numerous professional, scientific groups that have peer reviewed and accepted the validity of OCME’s use of the FST. These include the NYSCFS, established pursuant to article 49-B of the Executive Law, which is responsible for conducting DNA quality assurance audits of OCME (see People’s affirmation, July 27, 2012, exhibit E [accrediting LCN DNA], n 12 [accrediting the FST]); the NFSTC, an independent body, which, in a letter, determined that the FST is not a novel procedure, that it met the requirements of a software modification and approved its use (see People’s affirmation, Jan. 10, 2013 at 26 n 5); and others that published peer reviewed articles in professional journals such as the International Journal of Forensic Genetics (see People’s affirmation, Jan. 10, 2013, exhibits D1-D7). The FST was also admitted numerous times in trials in New York City (see People’s affirmation, July 27, 2012 at 12 n 12), and the FST and OCME’s empirical estimation of drop-in and drop-out rates have been presented at numerous national and international scientific conferences (see People’s affirmation, July 27, 2012, exhibits H, I).
Computer software programs that allow for drop-in and dropout rates when calculating likelihood ratios are not new or novel *489 in the scientific community. They simply apply accepted mathematical formulas to already existing data previously created by LCN DNA techniques which, as seen above, are, when properly performed, generally accepted as reliable in the scientific community. Other software programs such as True Allele, Life TD, Forenism, and Locomation, a software tool designed in the 1990s, also use Bayes’ Theorem to perform functions similar to the FST. The difference is that the FST uses empirically established drop-in and drop-out rates generated by thousands of tests, rather than just estimating them, which makes the FST more accurate as a predictor of likelihood ratios (see People’s affirmation, Jan. 10, 2013 at 9-11, ¶¶ 16-18). Merely because OCME did not begin using the FST until 2011 after first conducting over 2,000 tests involving over a half million calculations does not alone make the FST a new or novel procedure (see People’s affirmation, Jan. 10, 2013 at 5, ¶ 13; 8, ¶ 15; 18-19, ¶ 22).
Defendant’s alternative request to preclude evidence of likelihood ratios because they are of little probative value or because they are highly prejudicial is denied (see defense affirmation, July 9, 2012 at 3, ¶ 5). The probative value of likelihood ratios outweighs any prejudice to defendant whose objections concern the weight not the admissibility of this evidence.
The Scientific Working Group on DNA Analysis Methods (abbreviated SWGDAM) is the scientific body that proposes revisions to the national quality assurance standards for the DNA community. It requires that a laboratory perform statistical analysis regardless of the number of alleles detected in a particular case (see People’s affirmation, Jan. 10, 2013 at 16, ¶ 21). Likelihood ratios are routinely presented in court in many cases (see David H. Kaye et al., Reference Guide on DNA Identification Evidence, in Federal Judicial Center, Reference Manual on Scientific Evidence at 172 [3d ed 2011]) and over objections based on Frye (see David H. Kaye et al., The New Wigmore: Expert Evidence [2d ed 2011]).
Without the benefit of the FST, jurors would receive less relevant information regarding the value of LCN DNA evidence. The People accurately note that “the modern trend in the law of evidence has been away from imposing a special test on scientific evidence and toward using the ‘traditional standards of relevancy and the need for expertise’ ” (Wesley, 83 NY2d at 426, citing 1 McCormick on Evidence § 203 at 873-874 [4th ed 1992]). Since some but not enough of the defendant’s DNA alleles could *490 be detected at locations in the DNA mixture, OCME, without resorting to the FST, could only provide two results: defendant could be a contributor or defendant cannot be excluded. But with the FST, OCME can attach a numerical statistic to the probability of obtaining the present mixture if it originated from the defendant and one unknown, unrelated person versus the probability that it originated from two unknown, unrelated persons. Likelihood ratios are expressed by OCME using the FST in terms of strength that are accepted by the scientific community as generally reliable, and actually favored the suspect in over one third of 300 separate cases resulting in 511 likelihood ratios reviewed by OCME in 2012 (see People’s affirmation, Jan. 10, 2013 at 16-18, ¶ 21).
It is abundantly clear from the foregoing that neither LCN DNA testing nor the FST is a new or novel science that requires a Frye hearing before it is admitted in evidence. Separately, this court also finds that LCN DNA testing conducted by OCME and its employment of the FST are both generally accepted as reliable in the forensic scientific community. Any defense arguments addressing the proper application, interpretation or methodology of LCN DNA testing or the FST are not the proper subject of a Frye hearing (see Wesley, 83 NY2d at 422). Such arguments go to the weight not the admissibility of the evidence, and are more properly addressed by cross-examination and through the use of defense experts. The concerns raised by the defense motion can be adequately addressed by the general requirement that the People must lay a proper foundation at trial before such evidence can be admitted (see Wesley, 83 NY2d at 425 [finding sufficient a foundation which “included testimony that the appropriate steps were taken in analyzing the DNA evidence and an analysis and explanation of the assumptions underlying the probability calculations”]). Defendant’s motion is in all respects denied.

. A formula that relates certain conditional probabilities to express the relative strength or likelihood of two hypotheses. This definition and the remaining definitions are found in Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed 2011), under the Glossary of Terms section beginning at page 199.

. A measure of the support that an observation provides for one hypothesis as opposed to an alternative hypothesis.

. Polymerase chain reaction, abbreviated PCR, is a process that mimics DNA’s own replication processes to generate millions of copies of short strands of DNA in a few hours.

. Short tandem repeat, abbreviated as STR, is a short, repeating DNA sequence of virtually identical base pair sequences arranged in succession at a specific locus on a chromosome. The number of repeats varies from individual to individual at some loci on the sequence which provides a forensic scientist with a basis for individual recognition.

. A picogram is a trillionth of a gram.

. The separation of DNA from the rest of the material contained in the sample.

. Determining the amount of DNA extracted.

. Amplification increases the number of copies of a DNA sequence usually by using PCR

. Determines the size of an STR segment by identifying the rate at which it passes through a gel mixture when an electric field is applied.

. A piece of DNA that is smaller than the true piece of DNA.

. An allele is one of several alternative forms of a gene located at a specific locus. Allelic drop-out refers to a piece of DNA that is not seen in a DNA result even though it is known to be in the sample.

. Refers to a minute piece of DNA or allele seen in a sample which cannot be attributed to the contributors to the sample.