UNITED STATES of America

v.

Johnny MORGAN, Defendant.

No. 12–CR–223 VM.

United States District Court,
S.D. New York.

Signed Oct. 2, 2014.

Filed Oct. 3, 2014.

Amy Garzon, Jessica Rose Lonergan, Sidhardha Kamaraju, United States Attor-

ney's Office, New York, NY, for United States of America.

Rita Marie Glavin, David Jeremy Driscoll, Michael Benjamin Weitman, Seward & Kissel LLP, William Joseph Stampur, Hurwitz Stampur & Roth, New York, NY, for Defendant.

## *DECISION AND ORDER*

VICTOR MARRERO, District Judge.

By Complaint dated March 2, 2012, defendant Johnny Morgan ("Morgan") was charged with possessing a firearm after being convicted of a felony, in violation of Title 18, United States Code, Section 922(g), and on March 15, 2012 a grand jury indicted Morgan on the same charge.

Morgan moved, pursuant to Federal Rules of Evidence 104(a), 401, 402, 403, and 702, to exclude any evidence at trial of low copy number ("LCN") DNA test results of samples taken from the gun at issue here, and requested a hearing under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. (Dkt. No. 66.) The Court granted the request for a *Daubert* hearing by endorsement dated January 24, 2014 (Dkt. No. 74) and held such hearing during a period of three days beginning January 29, 2014 (the "Hearing").

The Court has reviewed the extensive record in this matter, which includes: the parties' submissions (Def.'s Mem. in Supp. of Mot. to Exclude Evidence of Low Copy Number DNA Test Results and Request for a *Daubert* Hearing ("Def.'s Mem."), dated December 23, 2013, Dkt. No. 68; Gov't's Mem. in Opp. to Def.'s Mot. to Exclude Evidence of Low Copy Number DNA Test Results and Request for a *Daubert* Hearing ("Gov't's Mem."), dated January 23, 2014, Dkt. No. 72; Def.'s Reply Mem. in Further Supp. of Mot. to Exclude Evidence of Low Copy Number DNA Test Results and Request for a *Daubert* Hearing ("Def.'s Reply"), dated January 27, 2014, Dkt. No. 75), the testimony of Dr. Craig O'Connor and Dr. Allan Jamieson at the Hearing, and the exhibits introduced into the record at the Hearing. In the time that has elapsed since the initial Hearing, the parties have submitted numerous letters and briefs, all of which were considered by the Court. Also, on February 14, 2014, Morgan moved for sanctions and the exclusion of evidence, or, alternatively, to re-open the Hearing record (Dkt. No. 86) and the parties fully briefed that motion (Dkt. Nos.100, 103).

Upon consideration of the record as of September 18, 2014, on that date the Court issued an Order (Dkt. No. 160) closing the record and denying Morgan's motion to exclude evidence at trial of LCN test results (Dkt. No. 66), as well as his motions for sanctions and to reopen the record (Dkt. No. 86). In the instant Decision and Order, the Court states its reasoning and findings in reaching the determination that the methods of LCN DNA testing that the New York City Office of the Chief Medical Examiner ("OCME") employed are sufficiently reliable to satisfy the *Daubert* standard.

## I. BACKGROUND

### A. CASE AGAINST JOHNNY MORGAN

The indictment alleges that Morgan—after having previously been convicted of a felony—on or about February 20, 2012 possessed a .40 caliber, semi-automatic Glock pistol. (Dkt. No. 5.)

The following facts, which are in dispute, are culled from the testimony at the first trial in this case, which the Court held beginning September 30, 2013, and which resulted in a hung jury and mistrial.

Several eyewitnesses testified at trial that on February 20, 2012, Morgan had been at the Pompeii Lounge, a nightclub in the Bronx, New York. (Transcript of September 30, 2013 Trial, at 58, 66–67, 106, *United States v. Johnny Morgan*, 12–cr–223 ("Trial Tr.").) A member of the Pompeii Lounge's security detail testified that after he observed Morgan attempting to smoke a cigarette inside the nightclub, he told Morgan that it was closing time and asked Morgan to leave the premises. (*Id.* at 61.) Morgan was "upset[,]" "looked kind of. irate[,]" and "didn't leave willingly." (*Id.* at 61, 160–61.) Having been escorted toward a foyer and out the door, Morgan then returned to the foyer of the nightclub and, after an exchange of words with the owner of the nightclub, pulled out a pistol and pointed it at the owner. (*Id.* at 62–64, 105–08, 117, 164.) Morgan was again escorted outside the nightclub, and two to three minutes thereafter, individuals inside the nightclub heard two gunshots. (*Id.* at 66, 114.)

Responding to a 911 call in which a caller reported hearing gunshots, a law enforcement officer observed an unidentified man walking on the sidewalk of a dark street in the Bronx, New York. (*Id.* at 191–93.) After the law enforcement officer directed the man to stop, the man made an arm motion consistent with tossing an object under or between parked cars and onto the street. The law enforcement officer also heard a noise as if something metal or plastic had been dropped on the ground. (*Id.* at 195–98.) Shortly thereafter, the man was apprehended ten to fifteen feet away and did not have a weapon in his possession. (*Id.* at 199–200, 203). That man was later identified as Morgan. (*Id.* at 206, 261–62.) Another law enforcement officer subsequently located a gun in the area where the first officer had observed Morgan's arm motion and heard the noise of something striking the pavement. (*Id.* at 218, 254–55.) That gun was a .40 caliber Glock pistol. (*Id.* at 245.)

Law enforcement obtained three DNA swabs from the gun: one from the trigger and trigger guard; a second from the front strap, back strap, and side grip grooves; and a third from the slide grip grooves and release area. (Gov't's Mem. at 9.) An oral DNA swab was also collected from Morgan. *Id.*

At issue in this motion is OCME's report concerning the DNA testing performed on the gun swabs and the comparison of those results to Morgan's DNA profile.

## B.  *LCN DNA TESTING*

While traditional methods of DNA testing—starting with plentiful DNA source material and using that DNA to generate a DNA profile—have been nearly universally accepted by courts as reliable, the particular form of DNA testing at issue in this case relates to LCN DNA.[1] OCME is the only publicly funded lab in the United States that performs LCN testing. (Def.'s Mem. at 1.) It uses its LCN DNA testing protocols when the amount of source material is less than 100 picograms ("pg") of DNA, as distinguished from what it calls high copy number ("HCN") DNA analysis, which uses samples containing more than

---

**1.**  Both high and low copy number DNA testing are forms of DNA testing known as "PCR/STR" DNA analysis or DNA typing. Numerous federal and state court decisions describe PCR/STR DNA typing in great detail. These cases include *Maryland v. King,* —— . U.S. ——, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013); *United States v. Trala,* 162 F.Supp.2d 336 (D.Del.2001); and *People v. Garcia,* 39 Misc.3d 482, 963 N.Y.S.2d 517 (N.Y. Sup.Ct. Bronx Cnty.2013). The Court will assume familiarity with the steps and procedures of standard PCR/STR DNA analysis, as well as basic DNA and genetics terminology.

100 pg of DNA. (Gov't's Mem. at 8.) OCME's analysis of the gun swab in this case was based on approximately 14 pg of DNA (Transcript of January 29, 2014 *Daubert* Hearing, at 140, *United States v. Johnny Morgan*, 12–cr–223 ("Hearing Tr.").) Thus, under OCME's own definitions, the DNA analysis performed in this case was LCN DNA testing.[2]

OCME's LCN testing uses the same basic steps as HCN testing: (1) extraction of DNA from the sample (e.g., blood, bone, hair, saliva, semen, or skin cells), (2) quantitation of the amount of DNA extracted from the sample, (3) amplification of the DNA using polymerase chain reaction ("PCR"),[3] and (4) analysis. (Gov't's Mem. at 7–8.) The primary differences between HCN and LCN DNA testing are at the stages of amplification and analysis. (*Id.*)

The difference in the amplification step is that HCN DNA testing employs 28 "rounds" of PCR amplification whereas LCN DNA testing employs 31 rounds. (Def.'s Mem. at 6; Gov't's Mem. at 8; Hearing Tr. at 56.) The small quantity of starting material in conjunction with the increased number of rounds of PCR can result in an increase in "stochastic effects," which are random errors that create inaccuracies in DNA testing. (Hearing Tr. at 41.) The four most common stochastic effects, each in turn detailed below, are: allelic drop-in, allelic drop-out, stutter, and heterozygote peak imbalance. (*Id.* at 42.)

Allelic drop-in refers to the phenomenon that occurs when alleles[4] not originating from the principal DNA donors show up in a DNA profile. It can arise due to the increased sensitivity of LCN testing, which leads to the detection of low levels of extraneous DNA contamination that would not normally appear in HCN testing. (*Id.* at 45.)

Allelic drop-out occurs when alleles from the principal DNA donors fail to appear in the DNA profile, a result frequently caused by the failure of the LCN testing to detect an allele because of the small size of the sample. (*Id.*)

Stutter is a phenomenon that can occur during the amplification stage: when the

---

**2.** The Government expert and fact witness, Dr. Craig O'Connor ("O'Connor"), asserted in his testimony that LCN DNA results have been admitted in court over one hundred times. (Hearing Tr. at 79 ("We have a database that we keep in-house of testimonies, and today it's been over a hundred times that cases with low-copy number testing has [sic] been admitted in court.").) But the Government did not provide specifics that would permit verification of this assertion. The Court is not aware of any case in which LCN testing has been admitted in federal court. Although the Court in *United States v. McCluskey* ruled LCN testing evidence from a New Mexico lab to be inadmissible, its finding rested, at least partially, on that lab's lack of certification and validation of its LCN testing. *U.S. v. McCluskey*, 954 F.Supp.2d 1224, 1281 (D.N.M.2013). The *McCluskey* Court, in fact, contrasted that lab with OCME, noting that OCME "has done extensive internal validation of its LCN testing and has received certification and approval for it . . . ." *Id.* (citation omitted).

**3.** PCR is a scientific process that replicates DNA, increasing the amount of DNA present in a sample in order to facilitate DNA testing. *See People v. Garcia*, 39 Misc.3d 482, 963 N.Y.S.2d 517, 519 n. 3 (N.Y.Sup.Ct.Bronx Cnty.2013). The PCR process is aptly described as "a molecular Xerox machine." (Def.'s Mem. at 5.)

**4.** An allele is one of the alternative versions of a gene at a given location along a chromosome. An individual inherits two alleles for each gene, one from each parent. If the two alleles are the same, the individual is homozygous for that gene. If the alleles are different, the individual is heterozygous. Genetics Home Reference, http://ghr.nlm.nih.gov/glossary=allele (last visited Oct. 2, 2014); *see also* Hearing Tr. at 18–19 ("An allele is just a different form of the DNA at each locus.").

DNA is replicated, some of the alleles may become altered, creating a small amount of a different allele that is then detected in the analysis of the sample. Thus, when stutter occurs a false allele will be present in the resulting DNA profile that does not correspond to the donor's true DNA profile. (*Id.* at 42.)

Heterozygote peak imbalance is another stochastic effect that can take place during the amplification process. At any given locus, the quantity of the two alleles present should be equal. However, by reason of the increased rounds of amplification that LCN testing entails, one allele may be amplified to a greater extent than the other allele, creating more copies of one allele in comparison to the other. Hence, it will appear that one allele is present in a much greater quantity relative to the other allele, distorting the results of the test. (*Id.* at 44.)

## C. *OCME*

Established in 1918, OCME is the governmental agency that provides forensic analysis in the investigation of criminal matters that occur in New York City. DNA analysis at OCME is performed by the Department of Forensic Biology (the "Department"), which has executed DNA testing in criminal cases since 1991. The American Society of Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD")[5] first accredited OCME to perform DNA testing in 1995. OCME currently employs more than one hundred sixty criminalists to perform DNA testing. *See generally* NYC Office of the Chief Medical Examiner, http://www.nyc.gov/html/ocme/html/home/home.shtml (last visited Oct. 1, 2014). Along with its responsibility for all DNA testing involving New York City criminal cases, OCME provides its DNA testing services to police enforcement entities and criminal laboratories nationwide on a for-fee basis. (Hearing Tr. at 71–72.)

In its role as the New York City forensic crime lab, OCME performs both standard HCN DNA testing and also LCN DNA testing. OCME began to develop its capacity to perform LCN DNA testing in 2003 and 2004, when OCME first performed validation studies for its LCN DNA testing process. (Hearing Tr. at 81.) Validation refers to the process through which a procedure is evaluated to determine its efficacy and reliability for forensic casework. (Gov't's Mem., Ex. 5, at 3 ("SWGDAM Guidelines").) In performing validation studies, OCME tested the reliability of LCN testing with different quantities and types of DNA samples. (Gov't's Mem., Ex. 6 ("Validation Summary").) Based on these studies, OCME created its interpretation guidelines for LCN testing. (*Id.*)

OCME performed its validation studies based on the guidelines created by the Scientific Working Group of DNA Analysis Methods ("SWGDAM").[6] (Gov't's Mem. at

---

**5.** ASCLD is a not-for-profit corporation that specializes exclusively in the accreditation of public and private criminal laboratories. ASCLD's board of directors is elected by ASCLD's delegate assembly, a body composed of the directors of all laboratories and laboratory systems accredited by ASLCD. ASCLD/LAB Website, http://www.ascld-lab.org/ (last visited Oct. 2, 2014).

**6.** SWGDAM is a working group composed of forensic scientists from international, federal, state, and local forensic DNA laboratories as well as academics and representatives of other federal agencies. The Director of the FBI's Laboratory Division selects SWGDAM's Chairman, who in turn appoints members based on a Nominating Committee's recommendations. SWGDAM's membership elects the Executive Board members. SWGDAM meets at least semi-annually and provides "a forum to discuss, share, and evaluate forensic biology methods, protocols, training, and re-

5.) As SWGDAM recommends, OCME used known samples in performing validation, so that it could verify its results. (Hearing Tr. at 87.) OCME ran various tests as part of its validation. In connection with that process, to determine the sensitivity of its LCN procedures, OCME tested single-source DNA samples of 150 pg, 100 pg, 50 pg, 25 pg, 12.5 pg, and 6.25 pg. (Validation Summary at Volumes 3, 4A, 4B.) For the samples containing between 150 and 25 pg, OCME successfully determined 92 percent of all alleles, while in the 12.5 and 6.25 pg samples, OCME determined 77 percent and 51 percent respectively of all expected alleles. Theresa Caragine et al., *Validation of Testing and Interpretation Protocols for Low Template DNA Samples Using Ampflstr Identifiler*, 50 Croat. Med. J. 250, 255 (2009).

OCME further performed LCN testing on mixture samples containing two DNA contributors. (Validation Summary at Volumes 9A, 9B.) The goal of these tests was to determine whether OCME's testing could accurately ascertain the DNA profile of the "major contributor"—the contributor with the larger percentage of DNA in the sample. (*Id.*) One of these studies tested samples with ratios of 1:1, 1:3, and 1:5 between the two DNA contributors using three different DNA amounts: 100, 50, and 25 pg. (*Id.*) A second study of mixtures tested samples all containing 100 pg of DNA, with ratios between the two contributors of 1:50, 1:20, 1:10, 1:5, 1:3, and 1:1. (*Id.*) These tests were performed using only high-quality buccal swab samples. (*Id.*)

In addition to the sensitivity and mixture studies, OCME performed LCN testing on a variety of different types of samples, including buccal swabs, bloodstains, semen swabs, and bones. (*Id.* at Volumes 8A, 8B, 8C.) In total, OCME examined over eight hundred DNA samples as part of its validation studies. Caragine et al., *supra*, at 251. Based on the results of these validation studies, OCME created its interpretation guidelines, intended to allow for consistent interpretation of LCN testing results by accounting for the presence of increased stochastic effects as the quantity of DNA decreases. (Hearing Tr. at 77.)

D. *ACCREDITATION AND APPROVAL*

As discussed above, OCME is currently accredited by ASCLD, a process that entails scrutiny of OCME's technical operations. (*See* Gov't's Mem. at 3.) The accreditation process begins with the lab's submission of an application to ASCLD, which contains documentation of the lab's conformity with ASCLD's requirements. ASCLD then performs an on-site assessment of the lab. The ASCLD assessment team interviews all relevant employees and observes the employees performing their job functions. Further, the assessment team reviews records to ensure that the documents provided in the initial application by the lab were accurate. Also analyzed are case records, to determine whether conclusions reached by the lab are accurate and appropriate. Following the on-site assessment, ASCLD issues a report de-

search to enhance forensic biology services as well as provide recommendations to the FBI Director on quality assurance standards for forensic DNA analysis." SWGDAM's responsibilities include recommending revisions, as necessary, to the Quality Assurance Standards for Forensic DNA Testing Laboratories and the Quality Assurance Standards for DNA Databasing Laboratories and proposing and conducting research to develop and validate forensic biology methods. *See generally* Scientific Working Group on DNA Analysis Methods http://www.swgdam.org/ (last visited Oct. 2, 2014).

tailing whether the lab has met the accreditation requirements. (Gov't's Mem., Ex. 2.)

ASCLD accreditation lasts for five years. Still, the laboratory has continuing responsibilities throughout the five-year period to maintain accreditation. Labs must maintain records proving conformity with all accreditation requirements and submit an annual report detailing such compliance. Further, all labs must undergo external proficiency testing by independent test providers and submit the results to ASCLD. Finally, ASCLD performs surveillance visits at least once every two years to monitor compliance. (*Id.*)

Aside from its ASCLD certification, OCME's LCN testing and interpretation guidelines were reviewed and approved by the New York State Commission on Forensic Science (the "Commission") in 2005. (Gov't's Mem. at 4.) The Commission is the governmental body tasked with developing minimum standards and accreditation programs for all forensic laboratories in New York State. N.Y. Executive Law § 995–b (McKinney 2013). In addition, the Commission approves forensic laboratories to perform specific forensic methodologies. *Id.* The Commission's objectives are to increase and maintain the effectiveness, efficiency, reliability, and accuracy of forensic laboratories, ensure that forensic analyses are performed in accordance with the highest scientific standards practicable, and set forth minimum requirements for the quality and maintenance of equipment. *Id.* at § 995–b(2).

The DNA Subcommittee of the New York Commission on Forensic Science ("DNA Subcommittee") is the body appointed by the Commission to perform accreditation of all DNA laboratories in New York. *Id.* at § 995–b(2–a). Further, the DNA Subcommittee is charged with assessing all DNA methodologies proposed to be used for forensic analysis. *Id.* at § 995–b(13)(b). It has the sole authority to grant, deny, review, or modify a DNA forensic laboratory accreditation, which the DNA Subcommittee exercises by issuing a binding recommendation to the Commission. *Id.* at § 995–b(2–b). While the Commission can request that the DNA Subcommittee reconsider its findings, the DNA Subcommittee is the final decisionmaker regarding laboratory accreditation. *Id.*

The chair of the DNA Subcommittee is appointed by the chair of the Commission. *Id.* at § 995–b(13)(a). It is in turn the responsibility of the chair of the DNA Subcommittee to appoint all other members. *Id.* Members of the DNA subcommittee represent different areas of expertise within the DNA field. *Id.* When the DNA Subcommittee approved OCME's use of LCN DNA testing in 2005, the DNA Subcommittee members included Jack Ballantyne, George Carmody, Ranajit Chakraborty, Anne Walsh, Thomas Shows, and David Werrett,—a group each of whose members possessed a Ph.D. as well as extensive experience and publication in the DNA field. (Gov't's Mem., Ex. 4; Letter from Government dated January 24, 2014, Dkt. No. 79, Ex. B at ¶ 3.)

## II.  *LEGAL STANDARD*

■ Federal Rule of Evidence 702 permits the admission of expert testimony as long as:

a) the expert's scientific ... knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; b) the testimony is based on sufficient facts or data; c) the testimony is the product of reliable principles and methods; and d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. The Supreme Court in *Daubert* defined the role of the district court as that of a gatekeeper charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. In determining the admissibility of expert testimony, "[i]t is the proponent's burden under *Daubert* to establish admissibility, rather than the opponent's burden to establish inadmissibility." *Graham v. Playtex Prods.*, 993 F.Supp. 127, 129 (N.D.N.Y. 1998).

To assist with the task of determining the reliability of expert testimony, *Daubert* provided the district court with four nonexclusive criteria to apply to the expert's reasoning or methodology: (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002) (citations omitted) (*quoting Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786). These factors do not constitute a "definitive checklist or test," *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786, and the "trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In making its determination, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266. Still, the Supreme Court held in *General Electric Company v. Joiner* that "conclusions and methodology are not entirely distinct from one another.... [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (*quoting General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). As such, "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* The district court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267.

The Court's determination should be made in accordance with "the liberal admissibility standards of the federal rules and recognize[ ] that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.* Thus, the Federal Rules of Evidence 702 Advisory Committee found in examining post-*Daubert* case law that "the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702 advisory committee's note (2000 Amendments).

### III. DISCUSSION

Having considered the extensive record in this case, the Court finds for the reasons discussed below that OCME's LCN DNA test results and analysis at issue in this case are admissible under the standards set forth in *Daubert* and Federal Rule of Evidence 702.

## A. *ADEQUACY OF OCME'S VALIDATION STUDIES*

■ Morgan first argues that OCME's LCN testing interpretation protocols are not supported by their internal validation studies. More specifically, Morgan argues that the protocols derived from OCME's internal validation studies cannot reliably be applied to a 14.2 pg, degraded, mixed sample when the validation studies tested only pristine samples with two contributors at a minimum of 25 pg.

The concerns Morgan raises about the limits of the validation studies OCME conducted, as applied in this case, warrant careful inquiry. Even the most outspoken advocates of LCN testing emphasize the need for caution when interpreting results, particularly as mixed DNA quantities are reduced. *See* Caragine et al., *supra.* The Government, however, has clearly established that OCME's validation studies are scientifically valid and bear a sufficient analytical relationship to their protocols. Thus, Morgan's objections go to the weight to be accorded to the evidence, not to its admissibility.

■ *Daubert* requires that scientific testimony have "a grounding in the methods and procedures of science" and be based on "more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. This standard does not, however, require that every conceivable application of a scientific methodology be tested. *See United States v. Mitchell,* 365 F.3d 215, 238 (3d Cir.2004) (holding that "directed, specific actual testing" is not required under *Daubert* ). Each of the three characteristics of the crime scene sample that Morgan has presented as problematic—the small quantity, the mixed DNA, and the degradation—was tested in OCME's validation studies. The purpose of each validation study was different, but, taken together, they formed the basis for

robust and reliable interpretation protocols under a variety of circumstances. Casework sample studies established that testing a variety of single- and mixed-sample sources, including degraded and touched objects, could produce reliable results. (Validation Summary at Volumes 8A, 8B, 8C.) Sensitivity studies established that quantities as small as 6.25 pg—smaller than the quantity at issue in this case—could be typed successfully with one hundred percent concordance with known results. (*Id.* at 4A, 4B.) Furthermore, mixture studies showed that OCME's LCN protocols could distinguish a major contributor even in the presence of stochastic effects. (*Id.* at 9A, 9B.) Most importantly, for the casework sample, mixture, and sensitivity studies—over one hundred distinct samples in total—all allelic assignments made were correct. *See* Caragine et al., *supra,* at 250–67. While OCME did not test the exact combination of circumstances seen here, their studies, which need not be conclusive under *Daubert,* established a scientifically sound basis to infer the behavior of a sample with a different combination of previously tested characteristics.

■ Moreover, there is no evidence before the Court that OCME's interpretation protocols were reached in error or a manner inconsistent with the validation data. Dr. Allan Jamieson ("Jamieson"), Morgan's expert witness, suggests that some validation data allows for alternative interpretations that were not included in OCME's final protocols. (*See, e.g.,* Hearing Tr. at 320 ("[T]he data allows for quite a lot of leeway in terms of interpretation.").) However, under *Daubert,* the possibility that a different conclusion could be drawn from validation data does not undercut the reliability of the conclusion that was drawn, as long as the expert has "good grounds" for the chosen interpreta-

tion. *See Guild v. General Motors Corp.,* 53 F.Supp.2d 363, 369 (W.D.N.Y.1999) ("[T]he mere fact that a difference of opinion exists does not make plaintiff's experts' conclusions inherently unreliable. Such differences of opinion and alleged weaknesses in the experts' methodologies will go to the weight to be given the expert testimony, not its admissibility."). Here, the "good grounds" standard is clearly met by the Government, whose expert witness described in great detail OCME's LCN testing protocols and the thought process behind each judgment call. Conflicting testimony regarding multiple scientifically valid interpretations is precisely the type of disagreement that the flexible thrust of *Daubert* entrusts the jury to decide. *See In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 172–74 (S.D.N.Y.2009) (*quoting Kumho Tire Co.,* 526 U.S. at 153, 119 S.Ct. 1167) ("If an expert's testimony lies within 'the range where experts might reasonably differ,'" it is the trier-of-fact who should " 'decide among the conflicting views of different experts.' ").

Most persuasively, the scientific community—a number of independent experts intimately familiar with the criteria for scientific validity—has repeatedly endorsed the sufficiency of OCME's validation studies and protocols. Even Jamieson agreed with the Government that OCME's most controversial validation study, its LCN mixture study, meets guidelines established by SWGDAM. (Hearing Tr. at 308.) The studies were also examined and implicitly declared reliable by the Commission and its DNA Subcommittee, both comprised of leading experts in the field. Although Morgan claims, based on the testimony of one former DNA Subcommittee

member, that the Subcommittee "had not done an exhaustive review" of the OCME validation studies (Def.'s Mem., Ex. Q), the transcript of the Subcommittee's relevant hearing—in which DNA Subcommittee members ask a broad range of questions about specific validation studies, including the mixture studies—suggests otherwise. (Decl. of Rita M. Glavin in Supp. of Mot. to Exclude DNA Evidence, dated Feb. 14, 2014, Dkt. No. 88, Ex. B.) Moreover, that the DNA Subcommittee asked for more time to review the data, additional experiments, and more documentation prior to granting its approval shows that the Subcommittee had and used opportunities for critical evaluation. (*See* Def.'s Reply Br. in Further Supp. of His Mot. for Sanctions and Exclusion of Evidence ("Def.'s Sanctions Reply"), dated Feb. 23, 2014, Dkt. No. 103, at 2.) OCME's LCN validations also withstood the scrutiny of peer review in a scientific journal, strong evidence of the general acceptance OCME's specific LCN testing methodologies in the scientific community. (Gov't's Mem., Exs. 15, 16.)

■ Morgan cites several journal articles suggesting that LCN mixture interpretation guidelines, including OCME's, lack sufficient validation. (*See* Def.'s Mem., Ex. J at 212 ("To date well-developed LCN interpretation guidelines for mixtures have not been described. Since many touch samples are mixtures, a lack of validation studies and interpretation guidelines is a serious deficiency."). Morgan also highlights that the FBI does not accept LCN samples into its CODIS [7] database (*see* Def.'s Mem., Ex. D at § 4.2.1.10), and that in at least one other

---

7. CODIS—the commonly-used acronym for the "Combined DNA Index System"—encompasses the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases. Fre-

quently Asked Questions (FAQs) on the CODIS Program and the National DNA Index System http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-factsheet (last visited Oct. 2, 2014).

federal jurisdiction the United States Attorney and the FBI argued that LCN results were too unreliable for admission for the purposes at issue in one case (*see* Letter from Morgan dated Sept. 12, 2014, Dkt. No. 157). However, under *Daubert*, an admissible scientific technique need not be beyond substantive, legitimate debate. *See Amorgianos*, 303 F.3d at 266 ("This is not to suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions."). The publications and testimony the Government has presented demonstrate persuasively that, despite dissenting voices, a sufficient scientific underpinning for OCME's LCN methodology exists. It is appropriate, and indeed important, to consider the more controversial aspects of OCME's LCN methodology—but the proper forum for the debate is before a jury, and it is for the jury to decide which of two conflicting experts' testimony to credit, and how much weight to give the evidence it accepts.

B. *SIZE AND QUALITY OF DNA SAMPLES*

■ Morgan also argues that the sample in this case was too small (14.15 pg) to obtain reliable results. This contention reflects an incorrect assumption about the relationship between DNA quantity and testability. Witnesses for both the defense and Government stated that it is not the numerical quantity of DNA that matters, but the extent of the stochastic effects. (Hearing Tr. at 321 ("[T]he amount of DNA isn't the issue; it's the presence of stochastic effects.").) Although the presence of stochastic effects tends to correlate with DNA quantity, it is possible that a 14–pg sample may exhibit fewer stochastic effects than a 25–pg sample and therefore provide better results. (*See*, Hearing Tr. at 321; 359.) Thus, assigning a blanket DNA minimum threshold is misguided when the real interpretive challenge—the presence of stochastic effects—is not perfectly correlated with quantity and can typically be determined by reviewing LCN test results. This reality was reflected in the DNA Subcommittee's unanimous conclusion reached at a May 2014 hearing and holding that scientifically, there is no lower limit for the quantity of DNA that must be met before LCN techniques can be reliably employed. (*See* Letter from Morgan dated June 2, 2014, Dkt. No. 132.) Stating as a categorical matter that DNA testing cannot be conducted below a certain quantity level is false as a scientific matter, and therefore cannot form the basis of a sound legal argument.

■ That OCME's mixture validation studies were done with buccal swabs and not crime-stain samples does not render the studies at issue here unreliable. Morgan argues that validation data derived only from pristine buccal swabs does not constitute a reliable basis for interpretation protocols primarily applied to degraded, crime-stain mixtures. (Def.'s Mem. at 22–23.) But OCME comported with SWGDAM guidelines and scientific best practices by using high-quality, known, nonprobative samples in its mixture validation studies. The Government's and Morgan's experts agreed that starting with high-quality, known samples to validate OCME's interpretation guidelines was both appropriate and necessary. (Hearing Tr. at 248, 310.) As noted in the testimony of both experts, the purpose of starting with a pristine sample is to see what a particular outcome—for example, a major contributor in a mixture—should look like under ideal conditions and to use that as a basis of comparison for unknown forensic samples. (*Id.*) The use of known and nonprobative buccal swab samples also satisfies SWGDAM guideline 4.1, which requires that "[m]ethods intended

for casework samples should be evaluated and tested using known samples and non-probative evidence samples...." (SWGDAM Guidelines at 8.)

Morgan points to SWGDAM guideline 4.4—"[m]ixed DNA samples that are representative of those typically encountered by the testing laboratory should be evaluated"—as evidence that OCME's testing was insufficient. (SWGDAM Guidelines at 9–10.) This argument is certainly one that the defense can introduce at trial to rebut the Government's evidence. But this SWGDAM validation guideline by itself is insufficient to establish that OCME's methodology was fundamentally flawed for purposes of the *Daubert* analysis. Compliance with SWGDAM validation guidelines, although valuable evidence of reliability, is neither mandatory nor dispositive. The overwhelming weight of the evidence— OCME's approval by multiple expert committees, OCME's multiple publications, and O'Connor's testimony—demonstrates that OCME's LCN testing methodology is firmly rooted in science and that, even if the underlying studies fall short on one specific provision, OCME's validation studies were reliable rather than merely subjective or speculative. Although OCME could have conducted more validation studies with degraded or crime-stain mixture samples, under *Daubert*, scientific techniques need not be tested so extensively as to create an absolute certainty in their reliability. Thus, additional validation studies using crime-stain or degraded mixture samples might have bolstered the strength of OCME's conclusions, but are not prerequisites to a finding of reliability sufficient to satisfy the Daubert test. *See e.g., United States v. Zajac,* 749 F.Supp.2d 1299, 1306 (D.Ut.2010) ("[T]he test for admissibility is not that Michaud had to conduct every conceivable test to determine consistency and absolute certainty.... *Daubert* does not require a validation study on every single compound tested.").

## C. *OCME'S USE OF PEAK HEIGHT DATA*

Morgan also challenges the reliability of OCME's interpretation protocols that rely on the use of allelic peak height as a proxy for quantity of DNA present. More specifically, Morgan argues that, because peak height is prone to error in LCN testing, OCME's interpretation protocols that depend on the accuracy of peak height are unreliable. (Hearing Tr. at 324.) Morgan's basic factual premise— that peak heights do not in every case provide accurate indicators of DNA quantity in LCN testing—is undisputed by the Government. However, his argument that the use of peak heights as a basis for LCN interpretation protocols is therefore unreliable does not logically follow, nor does it withstand the strong evidence, described below, that peak height can be used reliably to interpret LCN testing results with appropriate interpretation protocols and procedural safeguards in place.

OCME's use of peak heights in its interpretation guidelines is not only consistent with the scientific mainstream, but also with officially-recognized best practices. During the *Daubert* Hearing, Jamieson testified that "routinely in low-template DNA, one does not use peak heights to make inferences." (Hearing Tr. at 321.) However, Jamieson's statement is not supported by the record. The two interpretation protocols with which he took greatest issue—the use of peak-height ratio data to formulate mixture interpretation guidelines and the use of peak-height ratio data to assess whether alleles are heterozygous—are explicitly advocated by the arbiters of forensic DNA best practices. In its 2012 validation guidelines, for example, SWGDAM states: "Lower template DNA

may cause extreme heterozygote imbalance; as such, empirical heterozygote peak-height ratio data could be used to formulate mixture interpretation guidelines and determine the appropriate ratio by which two peaks are determined to be heterozygotes." (SWGDAM Guidelines at 5.) Thus, the written consensus of fifty forensic DNA scientists charged with drafting industry-standard validation guidelines clearly establishes that OCME's interpretation of peak heights is "more than a subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

OCME's peak-height related LCN protocols are also validated by sufficient data to establish their reliability under *Daubert* and Rule 702. Morgan claims that peak-height ratio data cannot provide sufficient information to discern a major contributor. However, the validation studies—in which every locus assigned to a major contributor at a variety of ratios and sample sizes was correct—demonstrate empirically that the protocols *did* provide sufficient information to enable the test to deduce a known major contributor. *See* Caragine et al., *supra*, at 250–67.

Finally, even if the Court were to accept Jamieson's testimony as scientifically valid, the specific concerns about peak height that he raises go to the weight rather than the admissibility of the LCN DNA evidence. Scientists clearly differ regarding whether it is appropriate to draw conclusions from peak height data when performing LCN testing. Ultimately, it is not the Court's role to weigh the credibility of competing scientific evidence. Such determinations should be left to a jury. *See Highland Capital Mgmt., L.P. v. Schneider*, 551 F.Supp.2d 173, 180 (S.D.N.Y.2008) ("[T]he jury can best form a judgment when presented with ... experts' competing theories." (quotation marks and citation omitted)).

### D. *NUMBER OF CONTRIBUTORS*

Morgan further argues that OCME's findings regarding the DNA sample in question are unreliable because, based on OCME's protocols, the sample contained DNA from three or more people, and OCME's mixture validation studies tested samples with only two contributors. OCME's protocols state that "[a] sample may be considered to have at least three or more contributors if five or more repeating alleles are present in at least two loci. Consider whether the repeating peaks appear to be true alleles or are PCR artifacts." (Def.'s Mem., Ex. H. at 45.) The sample at issue here shows five or more alleles at two different loci (five alleles at D8S1179 and seven alleles at D19S433). (Def.'s Mem., Ex. E at 3.) Morgan contends that, based on the protocols, the sample *must* contain at least three contributors. Morgan's further reasons that, because OCME performed no mixture validation studies with more than two DNA contributors, OCME's analysis of this sample is unreliable.

Morgan's argument misconstrues OCME's protocols. The protocols clearly give analysts discretion in determining the number of contributors, stating that a sample *may* be considered to have three or more contributors if there are five or more alleles present at two or more loci. (*Id.*) Analysts are permitted to examine the entire sample, not just the loci with five or more alleles, to determine whether all the alleles present are likely to be true alleles or merely the product of stochastic effects. (Hearing Tr. at 236.) Based on her analysis of the entire sample, the DNA analyst of the sample in question determined the sample contained DNA from two or more contributors. (Def.'s Mem.,

Ex. A at 3.) Such a finding was clearly within the analyst's permissible discretion and consistent with OCME's protocols.

Morgan additionally contends that, independent of OCME's protocols, the sample her must contain DNA from three contributors because of the presence of five or more alleles at two loci. This argument is overly simplistic, in that it fails to acknowledge that extra alleles can appear because of stochastic effects such as allelic drop-in. Morgan is quick to point to the presence of stochastic effects in LCN testing when arguing that such stochastic effects make LCN testing unreliable, (Def.'s Mem. at 14), but conveniently disregards the existence of the allelic drop-in phenomenon when claiming that the presence of more than five alleles at a loci must indicate the contribution of DNA from at least three individuals. As stated above, the DNA analyst in this case was well within the proper scope of her discretion to determine that the sample included two or more individuals. Morgan's argument is another example of a disagreement based on an alternative interpretation of the same data. As also stressed above, determining the relative credibility of the two interpretations falls within the provenance of the jury. See In re Fosamax, 645 F.Supp.2d at 172–74. Thus, the Court will not make such a credibility determination here.

E. REPRESENTATIONS TO THE NEW YORK COMMISSION ON FORENSIC SCIENCE

Morgan contends that representations OCME officials made to both the Commission and the DNA Subcommittee during the approval process for LCN testing indicate that the analysis of the sample in this case should be considered unreliable. Specifically, on numerous occasions in 2005 and 2006, OCME officials stated to both bodies that OCME would not test samples smaller than 20 pg. (See Def.'s Sanctions Reply at 1–5.) Morgan thus argues that not only was OCME not approved to perform LCN testing on the 14.2 pg sample here, but also that any such test under 20 pg must be unreliable.

Steps the DNA Subcommittee has taken as a result of the issues raised in this case assure the Court both that OCME had approval to perform the test in question and that OCME's representations in 2005 and 2006 do not indicate that the results for this sample are unreliable. Concerns Morgan has presented in this case motivated the Commission and the DNA Subcommittee to evaluate two questions: 1) Whether there is a quantity of DNA that is required before LCN testing can be done; and 2) whether OCME's standard operating procedures for LCN testing had changed since the DNA Subcommittee's approval of OCME's LCN testing in 2005, and if so, whether the changes required further validation. (See Letter from Government dated Mar. 31, 2014, Dkt. No. 117.)

The Court finds, based on the Commission and DNA Subcommittee's actions described in correspondence on the record, that OCME was approved to perform LCN testing on the sample here. In response to question one, the DNA Subcommittee determined that there is no lower limit below which LCN testing cannot be performed, though it declined to determine whether there is a lower limit below which OCME could not test based on OCME's validation studies and protocols. (See Letter from Morgan dated June 2, 2014, Dkt. No. 132.) Notably, the Commission's approval in 2005 did not provide a lower limit for OCME's LCN testing. (Gov.'s Mem., Ex. 3.) This fact, combined with the DNA Subcommittee's finding that generally there is no limit below which LCN testing cannot be done, indicates to the Court that

OCME was permitted to perform the test in question.

Further, the Court is persuaded that OCME's representations in 2005 and 2006 regarding a 20 pg threshold do not signal that any testing OCME performed below 20 pg is unreliable. In response to the second question above, members of the DNA Subcommittee during the summer of 2014 visited OCME and analyzed its standard operating procedures, protocols, and validations to determine whether any changes had occurred that would require further validation. *See 9–5–2014 DNA Subcommittee Meeting,* New York State Criminal Justice Services, http://www.criminaljustice.ny.gov/pio/openmeetings.htm (last visited Sept. 29, 2014). Despite its members' awareness that OCME was performing LCN testing on samples smaller than 20 pg, the DNA Subcommittee found that no substantive changes had occurred to OCME's standard operating procedures for LCN testing since the Subcommittee's approval in 2005. *Id.* Thus, the DNA Subcommittee did not express a view that the testing of samples smaller than 20 pg required OCME to perform further validation. OCME's representations to the Commission and the DNA Subcommittee that it would not test samples containing less than 20 pg are beside the point. Given the DNA Subcommittee's ratification of OCME's ability to perform LCN testing below 20 pg, the Court agrees that OCME's representations in 2005 and 2006 do not, in and of themselves, indicate that OCME's testing of samples smaller than 20 pg are unreliable.

## IV. *ORDER*

For the reasons and findings discussed above, it is hereby

**ORDERED** that the Court reaffirms its Order dated September 18, 2014 (Dkt. No. 160) denying the motions of defendant Johnny Morgan to exclude any evidence at trial of low copy number DNA test results, for sanctions, and to reopen the record (Dkt. Nos. 66, 86). Trial in this matter has been scheduled to commence on November 3, 2014. (*See* Dkt. No. 133.)

**SO ORDERED.**