(May 26, 2015)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANDRE GRAHAM, Appellant. [10 NYS3d 54]—

Judgment, Supreme Court, New York County (Carol Berkman, J., at jury trial and original sentencing; Marcy L. Kahn, J., at resentencing), rendered July 22, 2011, as amended April 9, 2013, convicting defendant of criminal possession of a weapon in the second and third degrees, and sentencing him, as a second violent felony offender, to an aggregate term of 10 years, reversed, on the facts, and the indictment dismissed. Appeal from order, same court (Marcy L. Kahn, J.), entered on or about August 9, 2013, which denied defendant's CPL 440.20 motion to set aside the sentence, dismissed as academic.

On this appeal, defendant does not ask us to reverse his convictions of criminal possession of a weapon in the second and third degrees on the ground that the trial evidence was legally insufficient to support such convictions. Instead, defendant argues that his convictions should be reversed because the jury's verdict was against the weight of the evidence. An appellate court weighing the evidence "must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (*People v Bleakley*, 69 NY2d 490, 495 [1987], quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [1943]). "If based on all the credible evidence a different finding would not have been unreasonable" and if the "trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (*id.*). When an appellate court performs weight of the evidence review, it sits, in effect, as a "thirteenth juror" (*Tibbs v Florida*, 457 US 31, 42 [1982]).

We agree with defendant that the verdict was against the weight of the evidence (*see People v Danielson*, 9 NY3d 342,

348-349 [2007]). The evidence failed to connect defendant with a pistol that had been discarded during a shooting incident. It is undisputed that defendant sustained gunshot wounds during this nighttime street incident, at which many persons were present, and at which at least two firearms were discharged. The People's theory was that defendant was not only a victim, but a participant in a gunfight, and that he fired the discarded pistol.

Contrary to the People's principal claim, DNA evidence did not connect defendant with the pistol. The People's expert testified that the codefendant's DNA conclusively matched DNA found on the pistol's trigger. She also testified that, elsewhere on the pistol, there was a mixture of DNA from at least three persons. Her testimony and the forensic testing documents introduced by the People established only that defendant "could" have been a contributor to that mixture. In other words, she could not rule defendant out as a contributor. This was the clear import of her testimony, particularly in light of the contrast between this portion of her testimony and the portion where she described the statistical certainty that the codefendant's DNA was on the trigger.

The dissent, however, contends that the clear import of the medical examiner's testimony should be disregarded because "elsewhere in her testimony she was conclusive and definitive in identifying defendant's DNA as matching the sample found on the gun's slide." Contrary to the dissent's contentions, the medical examiner never made any "conclusive and definite" statements that defendant's DNA matched the same found on the gun's slide. In fact, the sole basis for the dissent's allegations is the medical examiner's testimony that she found all of defendant's alleles matched those included in the DNA mixture. However, the dissent wishes us to ignore the medical examiner's testimony as to the relevance of this match. Unlike the medical examiner's testimony with regard to the codefendant, where she described the statistical certainty that the codefendant's DNA was on the trigger,* with regard to defendant, the medical examiner's assessment of the reliability of the DNA match was that defendant "could" have been a contributor to that mixture. In other words, the medical examiner could not rule out the reasonable possibility that another unrelated individual could match the DNA profile.

If, as the dissent speculates, the medical examiner's testi-

---

* Not only did the medical examiner testify that the codefendant (Perry) was a "match," but that "[i]f you took approximately 120 planet Earths each with 6.5 billion people, you would expect to see that DNA profile one time."

mony was actually intended to be more inculpatory of defendant, the People had ample opportunity to clarify it but failed to do so. The dissent, however, implies that it was defense counsel's responsibility to clarify the medical examiner's equivocal testimony. Of course, this runs counter to the fundamental principles of criminal law that the defendant has no burden to prove that he is not guilty. In any event, on cross-examination, defense counsel did provide the medical examiner an opportunity to clarify what she meant by reminding her of the previous statement she made on direct, "That [defendant's] allel[es] were present in the DNA allel[es] detected from that sample." The medical examiner, however, simply answered, "Correct," to defense counsel's followed up question, "Therefore, you stated that he could possibly be a contributor, correct?" Accordingly, the DNA evidence failed to establish that defendant ever touched this pistol, and it failed to establish his guilt, even when combined with the remaining evidence.

The sole testifying eyewitness was unable to identify defendant at any time. This witness admitted that she had impaired vision and was not wearing corrective lenses. She observed a man firing a weapon, but could only provide a generalized description, limited to height, weight, skin color and body type that fit defendant, but could also have fit many other persons. As noted, the incident occurred on a crowded street, and while defendant was undisputedly present, this witness's testimony failed to establish that defendant was the person she saw with a firearm. Moreover, the description could also have matched another man, who was subsequently arrested in possession of a revolver linked to this incident by way of a comparison with ballistics evidence found at the scene.

No other evidence introduced by the People offers any further support for their claim that defendant ever possessed the discarded pistol. Since there was no proof introduced relating to the bullets that struck defendant, the evidence even leaves open the possibility that the pistol at issue was the weapon that was used to shoot defendant himself.

In light of this disposition, it is unnecessary to reach any other issues. Concur—Renwick, J.P., Moskowitz, DeGrasse and Richter, JJ.

Saxe, J., dissents in a memorandum as follows: In my view, defendant's conviction of criminal possession of a weapon in the second and third degrees was properly supported by the necessary quantum of evidence, and I therefore disagree with the majority's dismissal of the indictment.

The evidence established that gunshots were fired in the

area of 111th Street between Fifth Avenue and Lenox Avenue on the evening of July 19, 2009 at around 7:30 or 8:00 p.m. Natasha Fraser was in the street across from the entrance to the apartment building located at 46-50 West 111th Street when she saw someone who appeared to be holding in his hand, and shooting, a flat, black gun. It was night, and she did not have on either her glasses or her contact lenses, and she had been trying to avoid the people fleeing from the gunfire, but she could see that the shooter seemed to be a black man with a "low haircut" and a "big neck," who stood about 5 feet 11 inches, and weighed "[a]nywhere from like 200 maybe to like 240, 230."

At 8:55 p.m., defendant walked into the St. Luke's Hospital Emergency Department with multiple gunshot wounds to his back and neck. At 9:00 p.m., Detective Roy Schmahl arrived at St. Luke's and spoke with defendant, who was conscious and had injuries to his upper torso and neck area. Defendant stood about 6 feet tall, weighed about 240 pounds, and had "close hair."

Sergeant Gerson Lopez and his partner, Andrew Seewald, arrived at 46-50 West 111th Street at about 10:30 p.m., and recovered four shell casings in close proximity to one another in the street, along with four deformed fragments of bullets, bullet impact marks and bullet holes on parked cars and a shattered back windshield. They also recovered from the bushes in front of 46-50 West 111th Street an operable .40 caliber semiautomatic Hi-Point gun, loaded with two cartridges, one in the chamber and one in the magazine. They swabbed the gun in several places for DNA, and sent the swabs for testing.

Medical Examiner Katey Nori concluded that while DNA found on the trigger/trigger guard of the recovered gun matched another suspect, Howard Perry, there were also small amounts of DNA present on the slide of the gun. She performed tests on that sample and determined that it contained a mixture of DNA from at least three people. From the mixture, Nori was able to form a full DNA profile, with "alleles in every single location," and when she compared the DNA alleles of defendant to the DNA alleles that were produced from the mixture, she found that all defendant's DNA alleles matched those included in the DNA mixture. While at one point in her testimony Nori said that defendant "*could* be one contributor to the sample" (emphasis added), she subsequently asserted definitively that "[e]very DNA allele in the profile of [defendant] . . . was also present in th[e] sample," and she answered

with a definitive "Yes" the question, "And in this case you determined that [defendant] was included in this mixture?"

A challenge to the weight of the evidence requires this Court to "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d 490, 495 [1987] [internal quotation marks omitted]). I submit that the trier of fact gave the appropriate weight to the People's evidence and the inferences to be drawn from it and that the verdict should not be set aside. The evidence fully justified the jury's finding that defendant was a participant in that gunfight and that he fired that pistol.

Natasha Fraser's testimony, combined with the evidence of defendant's presence at St. Luke's Hospital, easily permits the inference that defendant was present at, and a participant in, the shooting at 111th Street. The expert testimony regarding DNA on the gun found at the site of the shooting connected the use of the gun with defendant as well as with Perry.

The majority concludes that the conviction was against the weight of the evidence, because in its view the evidence failed to connect defendant with the pistol that had been used in the shooting incident. However, the majority overstates its case when it asserts that "[Nori's] testimony and the forensic testing documents introduced by the People established only that defendant 'could' have been a contributor to that mixture." Despite the expert's use of the word "could" when acknowledging that defendant "could be one contributor to the sample," elsewhere in her testimony she was conclusive and definitive in identifying defendant's DNA as matching the sample found on the gun's slide, when she answered "yes" to the question "And in this case you determined that [defendant] was included in this mixture?" In sum, there was a permissible inference from the DNA evidence that defendant had used the discarded gun, and that inference was not eliminated by the fact that the trigger of the gun held only Howard Perry's DNA.

Accordingly, I would affirm the conviction.