OPINION OF THE COURT
Marcy L. Kahn, J.
Defendants Aubin Debraux and Davone Merritt, by individual motions made in two separate indictments, have sought to preclude the People from introducing at their trials expert testimony as to any results derived from the use of the forensic statistical tool (FST), a mathematical computer software program developed and used by the Forensic Biology Unit of the New York City Office of the Chief Medical Examiner (OCME) to calculate a likelihood ratio that a specific individu *249 al’s deoxyribonucleic acid (DNA) is part of a mixture of DNA found on crime scene evidence. In the alternative, the defendants each seek hearings pursuant to Frye v United States (293 F 1013 [DC Cir 1923]). Because both of these motions raise identical legal issues and seek the same alternative forms of relief (among the others sought by the People and defendant Debraux, as discussed infra), and because the respective parties are represented in each case by the Office of the New York County District Attorney and the Legal Aid Society, this court has consolidated both cases solely for purposes of this decision and order.
I. Factual Background of the Cases
A. People v Debraux, Indictment Number 1653/2015
Defendant Debraux stands charged with one count of criminal possession of a weapon in the second degree (Penal Law § 265.03 [1] [b]) and one count of criminal possession of a weapon in the third degree (Penal Law § 265.02 [1]). By motion dated May 28, 2015 (affirmation of Robert Cannata, Esq., dated May 28, 2015, in support of order), the People moved for an order pursuant to CPL 240.40 (2) (b) (v) compelling defendant Debraux to provide a buccal swab for purposes of DNA testing by the OCME and comparison with a DNA sample derived from the swabbing of a semiautomatic handgun found in his hotel room after his departure. Testing of the sample conducted by the OCME revealed that the sample contained a mixture of DNA specimens from multiple contributors and that, although individual profiles could not be created, the results were found suitable for comparison with a DNA sample from an individual suspect.
B. People v Merritt, Indictment Number 3227/2014
Defendant Merritt stands charged with one count of attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), one count of attempted assault in the first degree (Penal Law §§ 110.00, 120.10 [1]), one count of assault in the second degree (Penal Law § 120.05 [2]), two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03 [1] [b]; [3]) and one count of criminal possession of a weapon in the third degree (Penal Law § 265.02 [3]). These charges arose from a shooting incident that took place outside a juice bar located at the intersection of Seventh Avenue and West 123rd Street in Manhattan, where police subsequently recovered a firearm which defendant Merritt had allegedly used in the incident and then discarded.
*250 A swab taken from the back strap, side grips and front strap of the gun yielded a mixture of DNA from at least two contributors (People v Merritt, indictment No. 3227/2014, affirmation of Bejal J. Shah, Esq. and Allison Lewis, Esq., dated July 1, 2015, in support of motion to preclude expert testimony or for a Frye hearing [defendant Merritt’s motion], exhibit A [laboratory report, OCME, Sept. 17, 2014] at 2). Upon testing, the OCME was able to determine a 14-loci DNA profile of a major male contributor, to whom the OCME referred as “Male Donor A” (id.). A second swab taken from the trigger and trigger guard of the gun also yielded a DNA mixture, but the DNA profiles of its multiple individual contributors could not be determined (id.). The results of the testing of both swabs were found to be suitable for comparison, however (id.).
Sometime prior to February 27, 2015, a DNA sample taken from a cigarette butt smoked by defendant while he was at the police precinct was compared to that of Male Donor A (defendant Merritt’s motion, exhibit B [laboratory report, OCME, Feb. 27, 2015] at 2). The OCME determined that defendant Merritt was likely to be the major male contributor to the DNA mixture from which the profile of Male Donor A was developed and that the DNA profile of Male Donor A could be found in no more than one in greater than 6.8 trillion people (id. at 1).
From the DNA mixture taken from the trigger and trigger guard of the gun, using FST analysis, the OCME determined that it was 13.6 billion times more probable that that sample originated from defendant Merritt and two other, unknown, unrelated persons than from three unknown, unrelated persons (id. at 2). Accordingly, the OCME concluded that the test results provided “very strong support” for the conclusion that defendant Merritt and two other unknown persons contributed to that DNA mixture (id.).
C. Consolidated Motions to Preclude Expert Testimony or Alternatively for a Frye Hearing
By cross motion filed June 30, 2015 (People v Debraux, indictment No. 1653/2015, affirmation of Beth Unger, Esq., filed June 30, 2015, in opposition to motion to compel DNA), and by motion filed July 1, 2015 (defendant Merritt’s motion), defendants Debraux and Merritt, respectively, challenged the OCME’s use of the FST. Specifically, while conceding that the use of likeli *251 hood ratios, Bayesian mathematics[1] and accounting for stochastic effects,[2] which are central to the FST, are all generally accepted techniques in the forensic scientific community for evaluating the probability that an individual’s DNA is present in a sample of multiple contributors, defendants here contend that the manner in which the FST accounts for stochastic effects is not generally accepted as reliable by that community, requiring either the total preclusion of any expert testimony based upon the FST from their trials, or the holding of Frye hearings at which the prosecution would be required to demonstrate the reliability of the approach utilized in the FST to account for stochastic effects. In addition, defendant Merritt asserts that a pretrial hearing on the admissibility of the FST results in his case is needed because the probative value of the FST results as evidence is substantially outweighed by their prejudicial and misleading effect upon the jury.
In their responses to both motions (People v Debraux, indictment No. 1653/2015, affirmation of Melissa Mourges, Esq., dated July 15, 2015, in reply to defendant’s motion opposing buccal swab and requesting protective order; People v Merritt, indictment No. 3227/2014, affirmation of Melissa Mourges, Esq., filed Aug. 19, 2015, in reply to defendant’s motion for Frye hearing [People’s reply]), the People maintained that the FST meets the standard of general acceptance in the forensic scientific community as reliable in all respects and that a Frye hearing is unnecessary.[3]
D. Related Issues in People v Debraux
Defendant Debraux also opposed the taking of the buccal swab sample. Alternatively, he argued that the People’s motion *252 for buccal swab testing should be held in abeyance pending a Mapp hearing (Mapp v Ohio, 367 US 643 [1961]), and cross-moved for a protective order. In reply, the People opposed delay of the testing, as well as any protective order.
By written order dated August 5, 2015, this court granted the People’s motion in Debraux to the extent of permitting the taking of saliva and buccal swab samples from defendant Debraux’s body; allowing the OCME to compare defendant Debraux’s DNA profile as derived from the buccal swab sample with the DNA sample derived from the swabbing of the handgun found in defendant Debraux’s hotel room; and permitting the OCME to upload defendant Debraux’s DNA sample into its own local database for purposes of comparison with other DNA profiles already on file in that database. This court also denied defendant Debraux’s request to delay determination of the People’s discovery motion pending the completion of the suppression hearings in that case, but granted defendant Debraux’s motion for a protective order, to the extent that it precluded the testing of defendant’s profile by OCME or any other agency for disease or genetic disorders, and directed OCME not to upload defendant’s DNA profile into any of the state or federal DNA data banks within the Combined DNA Index System, or CODIS,[4] unless and until such time as defendant Debraux is convicted and sentenced.
E. Rulings on Preclusion of Evidence and Request for Frye Hearing
Also on August 5, 2015, this court orally denied defendant Debraux’s cross motion to preclude the introduction of FST generated evidence at trial, or, in the alternative, for a Frye hearing, with written decision to follow.
*253 This written decision and order explains this court’s rulings in Debraux and sets forth its ruling denying defendant Merritt’s motion in its entirety.
II. Discussion
A. Consolidated Motions
The court will first address the common argument raised by both defendants that the lack of general acceptance of the FST as reliable in the forensic scientific community, because of its approach to accounting for stochastic effects, requires preclusion of expert testimony on FST results or, in the alternative, a Frye hearing.
The standard for admissibility of expert scientific testimony based upon novel methodology is “whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally” (People v Wesley, 83 NY2d 417, 422 [1994], citing Frye v United States). In determining whether a novel methodology meets the Frye standard, courts should be “counting scientists’ votes,” and not “verifying the soundness of a scientific conclusion” (Parker v Mobil Oil Corp., 7 NY3d 434, 446-447 [2006], quoting People v Wesley, 83 NY2d at 439 [Kaye, C.J., concurring]). The scientific procedures in question need not be “unanimously indorsed” by the scientific community, but must be “generally acceptable as reliable” (People v Middleton, 54 NY2d 42, 49 [1981]). The proponent of the proffered testimony has the burden to demonstrate that the methodology upon which the testimony is based is generally accepted as reliable within the relevant scientific community, which “can be demonstrated through scientific or legal writings, judicial opinions, or expert opinion other than that of the proffered expert” (Parker v Mobil Oil Corp., 16 AD3d 648, 648, 651 [2d Dept 2005], affd 7 NY3d 434 [2006]). Thus, “[a] court need not hold a Frye hearing where it can rely upon previous rulings in other court proceedings as an aid in determining the admissibility of the proffered testimony” (People v LeGrand, 8 NY3d 449, 457-458 [2007]). Moreover, “[a] Frye hearing is necessary only if expert testimony involves ‘novel or experimental’ matters” (People v Byrd, 51 AD3d 267, 274 [1st Dept 2008], Iv denied 10 NY3d 956 [2008], quoting Parker v Crown Equip. Corp., 39 AD3d 347, 348 [1st Dept 2007]), but not if the “application of a generally accepted technique . . . in a specific case [is] unique or modified” (People v Garcia, 39 Misc 3d 482, 484 [Sup Ct, Bronx *254 County 2013, Iacovetta, J.], citing People v Byrd, 51 AD3d at 274, and Styles v General Motors Corp., 20 AD3d 338 [1st Dept 2005]).
Two courts of coordinate jurisdiction have held extensive Frye hearings on the issue of FST reliability, and have reached divergent conclusions as the general acceptance of the FST as reliable in the relevant scientific community. In one of them, People v Rodriguez (Sup Ct, NY County, Oct. 24, 2013, Carruthers, J., indictment No. 5471/2009), on the basis of the testimony of eight witnesses and dozens of exhibits, including articles from scientific journals, multiple charts, tables and graphs (People v Rodriguez, slip op at 8 n 2), the court concluded that the FST is generally accepted as reliable in the forensic scientific community because it “rests firmly upon two pillars, Polymerase Chain Reaction-Short Tandem Repeat (PCR-STR) DNA analysis and the likelihood ratio.[5] Both have long been generally accepted by forensic scientists as reliable” (id. at 8 [footnote added]). The court also noted the People’s argument that the employment of likelihood ratios was “not novel,” but “was derived from a theorem devised by the Reverend Thomas Bayes in the mid-1700’s” (id. at 7). On the subject of the FST’s taking into account the stochastic effects of allelic drop-out and drop-in rates of a DNA sample in calculating the likelihood ratio, the court observed that “likelihood ratios accommodating allelic drop-out and drop-in, the primary analytic feature of FST, are generally accepted as reliable within the community of forensic scientists” (id. at 30).
In the other recent decision on FST reliability issued after a Frye hearing including testimony from expert witnesses, including some of those who testified in Rodriguez, People v *255 Collins (49 Misc 3d 595 [Sup Ct, Kings County 2015, Dwyer, J.]), the court concluded that “the FST is not generally accepted in the DNA scientific community” (49 Misc 3d at 621).[6] The Collins court reached this conclusion principally on the basis of the court’s agreement on the merits with the arguments of the defense experts criticizing the manner in which stochastic effects at each locus are assessed by the FST,[7] and therefore rejected the FST technique overall (see People v Collins, 49 Misc 3d at 613-620). Upon reargument, the Collins court criticized the analysis of the Rodriguez court for “pay-ting] no attention” to drop-in drop-out rates and other stochastic effects, and adhered to its conclusion that the “FST [is] not yet proved to be admissible under the Frye test” (id. at 628-629).
In the instant cases, as noted, the defendants do not challenge the FST to the extent that it is used to calculate likelihood ratios in DNA analysis. Neither do they challenge the use of Bayesian mathematical principles to make such calculations. Indeed, Collins, upon which the defendants rely, expressly states that no one disputes the use of Bayesian mathematical principles to calculate such probabilities (see 49 Misc 3d 613-615). Nor do the defendants challenge the general concept of taking stochastic effects into account in calculating likelihood ratios in DNA analysis of multiple source samples. Rather, defendants, relying on Collins, maintain that FST generated evidence should not be admissible in these cases because the specific manner in which the FST takes into account stochastic effects, including drop-in and drop-out rates, is not generally accepted in the forensic scientific community (id. at 615; see also People v Abney, Sup Ct, Kings County, July *256 7, 2015, Riviezzo, J., indictment No. 1234/2013, slip op at 4 [adopting Collins reasoning in granting Frye hearing on issue of whether “the FST and underlying methodology concerning drop-in and drop-out is generally accepted as reliable”]).
Both of the courts which have held Frye hearings on the FST have recognized that the FST’s approach to accounting for stochastic effects was designed to minimize the effect of random phenomena on the results obtained or conclusions drawn (see Rodriguez at 24 [“With obvious awareness of the advantage that the ‘(likelihood ratio) framework’ brings to the analysis of complex DNA mixtures, forensic scientists have developed several software programs, in addition to (the) FST, that enable (likelihood ratios) to be calculated which accommodate drop-out and drop-in”]; Collins, 15 NYS3d at 577-578 [“The key advance in programs like the FST is that they factor into the Bayesian calculations the likelihood that alleles have appeared or failed to appear as a result of stochastic effects”]).
The FST’s manner of accounting for stochastic effects, such as allelic drop-in and drop-out rates, may skew a likelihood ratio to one somewhat more favorable or somewhat less favorable to the prosecution or to the defense while not affecting the overall outcome of the inquiry whether it is more likely than not that a defendant was a contributor to a DNA mixture. For example, in People v Belle (47 Misc 3d 1218[A], 2015 NY Slip Op 50663 [U] [Sup Ct, Bronx County, Apr. 29, 2015, Fabrizio, J.]), the court found that the Legal Aid Society’s use of the same mathematical formulas as FST to calculate a likelihood ratio somewhat more favorable to the defense than that calculated by the FST, while still showing that the likelihood that DNA found on a gun was that of the defendant, did not affect general acceptance of FST as reliable in the forensic scientific community (Belle at *2).
Viewed in this light, the manner in which the FST accounts for stochastic effects in its probability computations appears to this court to be akin to the calculation of a margin of error of the test results. Arguments as to the accuracy of this procedure and its effect on the ultimate test results go to the weight of the evidence, rather than to questions of its admissibility, however, given the conceded general acceptance of the conceptual underpinnings upon which it is based. As such, they may be addressed by cross-examination or through the use of defense expert witnesses (see People v Williams, Sup Ct, Bronx County, May 20, 2015, Moore, J., indictment No. 3445/2008, *257 slip op at 3, citing People v Garcia, 39 Misc 3d at 490, accord People v Styles, 40 Misc 3d 1205[A], 2013 NY Slip Op 51019[U], *2 [Sup Ct, Kings County, June 13, 2013, Donnelly, J.]; see also Parker v Mobil Oil Corp., 7 NY3d at 447 [Frye inquiry as to whether scientific technique is generally accepted as reliable by scientific community is “separate and distinct” from inquiry as to whether technique was “appropriately employed in a particular case”]). Thus, the manner in which OCME incorporates the probability of stochastic effects, including allelic drop-in and drop-out rates, into the FST’s use of Bayesian mathematical principles to calculate likelihood ratios of the presence of an individual’s DNA in a mixed sample is properly a matter for consideration by the jury, as finder of fact at trial, and is not appropriate for resolution by this court in the context of a Frye admissibility analysis.
Even assuming that the defendants in these cases are correct in their view that the Frye standard should be applied to the specific methodology employed by the FST to account for stochastic effects in calculating a likelihood ratio, however, their argument that the OCME is the only laboratory to use the FST does not require the holding of a Frye hearing in these matters. The manner in which FST assessment of such effects and rates is performed need not be unanimously endorsed by the relevant scientific community in order to be generally accepted as reliable (People v Middleton, 54 NY2d at 49; see People v Belle at *5 [finding FST generally acceptable in the relevant scientific community while recognizing that “there will always be some scientific dissenters . . . [who] do not endorse the methodology of the FST”]).[8] Moreover, evidence derived from the application of a generally accepted technique, even if the application was unique[9] or modified in a particular case, is admissible without the need for a Frye hearing (People v Colon, Sup Ct, NY County, Nov. 19, 2014, Carro, J., indictment No. 5073/2010, slip op at 2, citing People v Garcia, 39 *258 Misc 3d at 484; see People v Byrd, 51 AD3d at 274; Parker v Crown Equip. Corp., 39 AD3d at 348; Styles v General Motors Corp., 20 AD3d 338, 342 [1st Dept 2005]).
Additionally, for purposes of Frye analysis, a court may rely upon “previous rulings in other court proceedings as aid in determining” whether a technique has been generally accepted and whether evidence generated by use of that technique is admissible (People v LeGrand, 8 NY3d at 458 [“Once a scientific procedure has been proved reliable, a Frye inquiry need not be conducted each time such evidence is offered (and courts) may take judicial notice of reliability of the general procedure,” quoting People v Wesley, 83 NY2d at 436 (Kaye, Ch. J., concurring)]). A review of the cases in which the general acceptance of the FST as reliable by the DNA scientific community has been challenged reveals that the vast majority of the trial court decisions rendered on that issue favor the Rodriguez court’s view that the FST is generally accepted as reliable in the forensic scientific community. For example, in People v Garcia, the court denied defendant’s motion for a Frye hearing on the issue of the FST’s general acceptance as reliable in the forensic scientific community, concluding that the FST is not a new or novel scientific technique, but is based upon “accepted mathematical formulas” used to calculate a likelihood ratio (39 Misc 3d at 489). In addition, the Garcia court observed that the OCME had “conducted exhaustive validation procedures before adopting [the] FST” (id. at 488).
In another decision favoring the Rodriguez view, People v Belle, the court noted that “the FST’s overall methodology has been certified and accredited by the New York State Commission on Forensic Science and the National Forensic Science Technology Center” (id. at *4). The Belle court also observed that “the FST methodology utilizing the OCME’s allele drop-in and drop-out rates has been repeatedly validated and approved by experts in the field” (id.-, see People v Garcia, 39 Mise 3d at 489 [same]; People v Williams at 5 [same]; People v Rodriguez at 51 [same]). Numerous other courts have accepted the views of Rodriguez, Garcia and Belle (see e.g. People v Brown, Sup Ct, NY County, June 4, 2015, Zweibel, J., indictment No. 58/ 2012; People v Williams, Sup Ct, Bronx County, May 20, 2015, Moore, J., indictment No. 3445/2008; People v Johnson, Sup Ct, Kings County, Apr. 21, 2015, D’Emic, J., indictment No. 4728/ 2013; People v Colon; People v Whetstone, Sup Ct, NY County, June 17, 2013, White, J., indictment No. 5728/2012; People v *259 Styles, 40 Misc 3d 1205[A], 2013 NY Slip Op 51019[U] [Sup Ct, Kings County, June 13, 2013, Donnelly, J.]; People v Foster-Bey, Sup Ct, Kings County, May 22, 2013, Goldberg, J., indictment No. 9239/2010; People v Caballero, Sup Ct, Queens County, Apr. 15, 2013, Knopf, J., indictment No. 10278/2011; People v Brissett, Sup Ct, Bronx County, Feb. 25, 2013, Webber, J., indictment No. 847/2010; People v Wortham, Sup Ct, NY County, Nov. 21, 2012, Ward, J., indictment No. 3148/2011).
Furthermore, were this court to hold a Frye hearing on this issue, it would undoubtedly duplicate the testimony of many of the same expert witnesses who have already testified in the hearings held in Rodriguez and Collins, including several witnesses who testified in both hearings, and revisit questions already resolved by numerous other courts. To do so would be, in this court’s view, an unnecessary expenditure of judicial resources.
Finally, it warrants repeating that in a Frye analysis, it is not the role of the court to evaluate and appraise the merits of the scientific technique under consideration. As the Court of Appeals has repeatedly counseled, a proper Frye analysis involves “counting scientists’ votes” rather than “verifying the soundness of a scientific conclusion” (Parker v Mobil Oil Corp., 7 NY3d at 446-447, quoting People v Wesley, 83 NY2d at 439 [Kaye, Ch. J., concurring]; People v LeGrand, 8 NY3d at 457, revg 196 Misc 2d 179 [Sup Ct, NY County 2002]).
Thus, this court is satisfied that the FST procedure for calculating likelihood ratios of an individual’s DNA in a mixed sample has been sufficiently shown to be generally accepted as reliable in the forensic scientific community, rendering a Frye hearing unnecessary as a precondition to the admission of such evidence at trial.
Defendant Merritt additionally seeks an in limine hearing on the admissibility of the FST results, claiming that their probative value would be substantially outweighed by their prejudice to him and misleading to the jury. Given that in this case, the other DNA sample from the back strap, side grips and front strap of the gun yielded a DNA mixture containing a 14-loci major male contributor to which defendant’s profile has proved to be a likely match, in that the DNA profile developed from that sample could be found in no more than one in greater than 6.8 trillion people, defendant Merritt’s claim of prejudice is baseless.
Accordingly, defendant Debraux’s cross motion and defendant Merritt’s motion to preclude expert testimony as to conclu *260 sions derived from the OCME’s use of the FST, or, in the alternative, for a Frye hearing, are both denied.
The court will now address the remaining motions made by the parties in defendant Debraux’s case only.
B. Motions for Testing and Protective Order in People v Debraux
Criminal Procedure Law § 240.40 (2) (b) authorizes a court in which an indictment is pending to grant, “subject to constitutional limitation,” an application by the prosecutor for an order compelling the defendant to provide non-testimonial evidence. Such evidence may include the taking of materials from his body, absent an unreasonable intrusion or the risk of serious physical injury (CPL 240.40 [2] [b] [v]).
The Court of Appeals has set forth the constitutional limitations on procedures involving corporeal evidence derived from a defendant’s body in its seminal decision, Matter of Abe A. (56 NY2d 288, 291 [1982]). The Court in Abe A. laid out its now-familiar three-part standard, requiring that the People “establish (1) probable cause to believe the suspect has committed the crime, (2) a ‘clear indication’ that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable” (id. at 291). In addition, the Abe A. Court added a constitutional caveat, requiring that the trial court engage in a balancing of factors in the circumstances of the particular case prior to rendering its decision: “[T]he issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect’s constitutional right to be free from bodily intrusion on the other” (id. at 291, 298). The Court characterized its constitutional prerequisite for ordering non-testimonial discovery of the defendant’s person as “a multifaceted one focusing on the bodily intrusion itself” and including “not only the probable worth of the evidence to the investigation, but the nature of alternative means, if any, for obtaining the evidence.” (Id. at 297, 298.)
Defendant Debraux’s challenge of the buccal swab testing sought by the People was based solely upon his assertion that the People have failed to satisfy the second prong of the Abe A. three-part test. Specifically, he maintained that there was no clear indication that relevant material evidence would have been found as a result of the OCME buccal swab testing the People sought here because the DNA profile of defendant *261 developed from the buccal swab sample results would have been compared with the sample taken from the handgun found at the crime scene by using the FST, which defendant contended, was unreliable and therefore could not produce relevant, material evidence. As this court has found the FST to be generally accepted as reliable for the reasons previously stated, this argument is without merit, and is, therefore, rejected.
Turning to the constitutional caveat articulated by the Court of Appeals in Abe A., the crimes in question, namely, criminal possession of a weapon in the second (Penal Law § 265.03 [1] [b]) and third (Penal Law § 265.02 [1]) degrees, class C violent and class D felonies, respectively, are serious offenses. As the results of the DNA testing in question could either implicate or exonerate defendant, its importance to the investigation of this case is clear. Moreover, the taking of a saliva sample by means of a buccal swab is minimally intrusive, and the court is not aware of any less intrusive means of obtaining DNA evidence. Therefore, in balancing the seriousness of the crimes in question and the importance to the investigation of this case of the DNA buccal swab testing against the minimal intrusiveness of the test, the court finds that such testing is justified under these circumstances. Thus, defendant’s argument that buccal swab testing would violate his rights to privacy and protection against unreasonable searches and seizures under the state (NY Const, art I, § 12) and federal (US Const Amend IV) constitutions is unavailing to him.
Neither has defendant Debraux demonstrated any need for holding the decision on the People’s motion in abeyance pending the outcome of a pretrial suppression hearing.
Accordingly, for these reasons, the People’s motion to compel defendant Debraux to submit to buccal swab testing has been granted.
The court now turns to defendant Debraux’s cross motion for a protective order pursuant to CPL 240.50 limiting disclosure of the buccal swab testing results to the court, the prosecution and defense counsel, and prohibiting OCME from uploading of his known DNA profile into SDIS or NDIS or its own local DNA database.
To the extent that defendant Debraux seeks a protective order which would preclude OCME from comparing his known DNA profiles to DNA profiles found in any state or federal database, such an order is unnecessary. As the People assert in *262 their reply, OCME has no direct access to retrieve information from the state or federal DNA databases, but can directly access only its own internal DNA database, to which no other agency has access (see People v Ishmael Cleare, Sup Ct, NY County, Jan. 5, 2012, Obús, J., indictment No. 3605/2011, slip op at 2 [terming motion for protective order, to the extent it sought to prohibit OCME access to state and federal DNA data banks to which OCME had no access, “largely moot” due to OCME’s lack of access to such databases]; People v Boyd, Sup Ct, Kings County, Jan. 6, 2011, Walsh, J., indictment No. 2999/ 2010, slip op at 2). While OCME does have permission to upload DNA profiles developed from forensic crime scene evidence to SDIS or NDIS, this limited authority should not be confused with the incorrect notion that OCME has direct access to state or federal DNA data banks. Moreover, other than DNA profiles of unidentified individuals derived from forensic crime scene evidence, OCME does not upload the DNA profile of any individual into any state or federal database until and unless that individual is convicted (People v Kroutcher, Sup Ct, Bronx County, Jan. 13, 2013, Carter, J., indictment No. 3117/ 2012, slip op at 2).
Citing People v Rodriguez (196 Misc 2d 217 [Sup Ct, Kings County 2003]), defendant Debraux maintains that a protective order prohibiting OCME from uploading his DNA profile into its own local database is appropriate, primarily on the grounds that such uploading would violate section 995-d of the Executive Law and because the legislature never contemplated the establishment of local databases, including OCME. I reject these arguments for reasons I have stated elsewhere, namely, that it is an early decision which incorrectly construes the state statute to limit local databases, as the majority of courts which have considered the issue have concluded (People v Rodney Stover, Sup Ct, NY County, June 17, 2015, Kahn, J., indictment No. 1512/2015, slip op at 10-17; see People v Garcia, Sup Ct, NY County, Jan. 14, 2014, Ward, J., indictment No. 5220/2013, slip op at 2; People v Kroutcher, Sup Ct, Bronx County, Jan. 13, 2013, Carter, J., indictment No. 3117/2012; People v Ishmael Cleare, slip op at 3; but see People v Matos, 37 Misc 3d 252, 262-263 [Crim Ct, Kings County 2012] [adopting the reasoning of Rodriguez]).
Nevertheless, OCME may ultimately acquire the ability to share with state or federal DNA databases DNA information concerning criminal defendants who, like defendant in this *263 case, have been charged with crimes but are presumed innocent until such time as they are convicted. In light of this possibility, and in order to safeguard the privacy of defendant given his current circumstances, this court has granted a protective order directing that OCME not upload defendant Debraux’s DNA profile to any state or federal databases unless or irnt.il such time as defendant is convicted and sentenced {see Executive Law § 995-c [3] [a] [“Any designated offender subsequent to conviction and sentencing . . . shall be required to provide a (DNA) sample . . . to be included in a state DNA identification index”]).
As there is no statutory or constitutional impediment to OCME’s uploading defendant Debraux’s DNA profile, once developed from defendant’s buccal swab sample, into its own local database, this court declines to issue a protective order prohibiting OCME from doing so.
Therefore, defendant’s cross motion for a protective order is granted in part and denied in part as set forth in the order of this court dated August 5, 2015.
III. Conclusion
Accordingly, defendant Debraux’s cross motion and defendant Merritt’s motion to preclude the introduction of FST generated evidence at trial or, in the alternative, for a Frye hearing, are both denied.
As to the remaining motions in People v Debraux, this court adheres to its rulings as set forth in the order of this court dated August 5, 2015.

. The mathematical formulas utilized by the FST were devised by Reverend Thomas Bayes and have been in use for centuries (see People v Rodriguez, Sup Ct, NY County, Oct. 24, 2013, Carruthers, J., indictment No. 5471/2009, slip op at 7).

. Stochastic effects are random imperfections, often in the form of additions or subtractions, within the sample examined, that result in the appearance or nonappearance in DNA mixtures of certain genetic material, known as alleles.

. By letter dated July 16, 2015, Merritt’s counsel provided the court and the prosecution with copies of two recent Kings County decisions of courts of coordinate jurisdiction, both of which ordered Frye hearings on the grounds sought here. In People v Collins (49 Misc 3d 595 [Sup Ct, Kings County 2015, Dwyer, J.]), the court ruled, after a lengthy Frye hearing, that the FST is not generally accepted as reliable in the forensic scientific community, and precluded its admission in all cases before it. In People v Abney (Sup Ct, Kings County, July 7, 2013, Riviezzo, J., indictment No. 1234/2013), the court ordered a Frye hearing on the FST and its underlying methodology.

. CODIS is the generic term used to describe the Federal Bureau of Investigation’s (FBI) program of support for criminal justice DNA databases, as well as the software used to run these databases. The National DNA Index System or NDIS, which is considered a component of CODIS on the national level, contains DNA profiles contributed by federal, state and local participating forensic laboratories. If any of eight local laboratories in New York State, or LDIS, determine the DNA profile of a contributor with a degree of certainty, the DNA profile is uploaded to the New York State Police Forensic Index, which, together with the Convicted Offender Index jointly maintained by the New York State Police and the New York State Division of Criminal Justice Services, is known as SDIS. This information is uploaded and shared with other states via one of the two components of NDIS, namely, the FBI Forensic Index or the FBI Convicted Offender Index (New York State Division of Criminal Justice Services, http://www.criminaljustice.ny.gov/ forensic/dnabrochure.htm [accessed Sept. 16, 2015]).

5. As the Rodriguez court explained:
“[A likelihood ratio] is a ratio of two probabilities!,] • . . that the suspect is a contributor to a DNA mixture on the one hand (the prosecution scenario), and, on the other hand, that the suspect is not a contributor (the defense scenario) ....
“[Likelihood ratios] calculated by means of the FST software account for the probability of the occurrence during DNA analysis of the stochastic or random phenomena of allelic drop-out and drop-in. An allele is one of several alternative forms of a gene located at a specific locus. Drop-out occurs when an allele that is actually known to exist at a particular locus in a DNA sample is not found in the analysis. Drop-out may occur during testing of very small amounts on DNA or of DNA that has been substantially degraded. Drop-in occurs when an allele is detected during analysis that is known not to belong to the person or persons contributing to the sample” (People v Rodriguez at 5).

. The Collins court also reached a similar conclusion as to high sensitivity or low copy number (LCN) analysis, which is used upon samples with fewer than 100 picograms of DNA material (49 Misc 3d at 603-612). Neither defendant Debraux nor defendant Merritt has challenged the reliability of LCN analysis on their instant motions, however.

. The Collins court reviewed four stochastic effects, including: drop-out; drop-in; “stutter,” “a common ‘echo’ effect appearing on the DNA profile— usually one allele before its true allele, or less frequently, just after,” and which “may show a peak as high or higher than the true allele”; and “peak heights,” referring to a phenomenon where “small amounts of DNA available for analysis may not yield consistent peak heights for the true alleles and may result in extraneous alleles at some loci that produce higher peaks than do the true alleles” (15 NYS3d at 571-572). In Collins, the defendants also argued that “the FST wrongly limits analysis to a numerator and a denominator each reflecting only a single hypothesis, and thus unscientifically prevents alternative analyses” (id. at 578). Defendants do not raise that argument here, however.

. This court notes that three of the dissenting witnesses who testified in People v Collins were employed by the same laboratory, the University of North Texas Health Science Center, and that a fourth dissenting witness operated a defense consulting firm (see 49 Misc 3d at 608-609).

. Additionally, the conclusion apparently reached by the Collins court, that the FBI and other laboratories do not employ the FST approach to accounting for stochastic effects because its methodology is deemed unreliable is, at the very least, subject to question, in light of the People’s uncontroverted proffer on tbe instant motion in Merritt that it is the extreme costliness of implementing the FST that has prevented the FBI and other laboratories from adopting the program (see People’s reply at 20-21).